HATCH ET AL. *v.* THE NEWARK TELEPHONE CO. ET AL.

(Decided January 31, 1930.)

*Messrs. Hedges, Hoover & Tingley,* for plaintiffs.
*Messrs. Wilson & Rector,* for defendants.

WASHBURN, J. This is an action on appeal by the defendants, the Newark Telephone Company and others, against whom judgment was rendered by the court of common pleas of Franklin county, enjoining the defendant company and its officers from carrying out a resolution adopted by the corporation, by which it is proposed to transfer the property and assets of the defendant West Virginia corporation to a similar corporation organized under the laws of Ohio, said West Virginia corporation to receive therefor stock of the Ohio corporation.

The defendant West Virginia corporation, which owns and operates an independent telephone exchange in the city of Newark, Ohio, and several adjoining towns, has been in existence since 1894. A number of years ago it was in serious difficulties, financial and otherwise, and the present officers took over its management and have succeeded in transforming it from a corporation of little or no value into a very prosperous and valuable one.

The capital of the company consists of 4,000 shares of $100 each of preferred stock, and 2,000 shares of $100 each of common stock, the stock, especially the preferred, being owned in small amounts by a large number of persons, most of whom are not familiar with the affairs of the company. The common and preferred stocks have equal voting rights, and by reason of that fact the voting power of the company is in the preferred stock.

To render difficult the acquiring of control of the company by promoters through the purchase of the

widely scattered preferred stock, the management decided to acquire a considerable amount of common stock, and then submit to the stockholders a plan to transfer the property and assets of the corporation to a corporation to be organized under the laws of Ohio, it to be so organized as to vest the voting power thereof in the common stock—which plan, if adopted and carried out, would vest the control of the Ohio corporation in the present owners of the common stock of the West Virginia corporation.

Accordingly, the officers, on March 9, 1928, sent to the stockholders a notice of a stockholders' meeting, as follows:

"The Newark Telephone Company,
Newark, Ohio, March 9, 1928.
"Notice of Annual Meeting of
Stockholders.

"The annual meeting of the stockholders of the Newark Telephone Company will be held at the principal office of the company in Newark, Ohio, on Monday, the 19th day of March, 1928, at 1:30 o'clock p. m., for the election of directors and for the transaction of such other business as may come before said meeting.

"At said meeting, in addition to the regular business aforesaid, there will be submitted to the stockholders, for consideration and such action thereon as they may see fit to take, a plan for the reorganization of said company under the laws of Ohio, substantially as follows, with such modifications and/or amplification thereof as may be made or authorized to be made at said meeting or at any adjournment thereof:

"1. That there be organized under the laws of Ohio a proper corporation, with an authorized capital of $500,000 par value of 6 per cent. cumulative preferred stock and 5,000 shares of no par common stock.

"2. That of said preferred stock, only $400,000 par amount, be presently issued, to be exchanged share for share for the outstanding preferred stock of the present company as hereinafter provided.

"3. That said 5,000 shares of common stock be issued and distributed *pro rata* to common stockholders of the present company in exchange for their common stock as hereinafter provided.

"4. That all the property, assets and franchises, subject to any obligations and indebtedness of the present company, be exchanged for said $400,000 par value of such preferred stock and 5,000 shares of said no par common stock, and provisions be made for exchanging said preferred stock, share for share, for the outstanding preferred stock of the present company and for exchanging said no par common stock at the rate of 2½ shares for one for the outstanding $100 par common stock of the present company.

"5. That provision be made that as long as the dividends on the preferred stock of the new company are paid promptly, the common stock shall be entitled to the *exclusive* voting power for election of directors and other incidental purposes, but that in case quarterly dividends on the preferred stock be passed or deferred for two successive periods of three months each, then the preferred stock shall be vested with voting power in conjunction with the common stock until such dividends so in default shall have been paid.

"6. That the directors of the present company, or some committee appointed at said meeting or some adjournment thereof, be authorized to supply any defect or omission or reconcile any inconsistencies in said plan in such manner and to such extent as they shall deem expedient to carry out the same properly and effectively, with power to abandon the same if they deem that expedient.

"7. That the proper officers of the company be authorized to make and prosecute all necessary applications to public authorities and do whatever may be necessary or proper to carry said plan into effect.

"T. J. Evans, Secretary.

"P. S.—Please sign and return proxy whether you expect to be present or not, as the same will only be used in the event of your absence."

The form of proxy inclosed with said notice contained the provision that "I do especially authorize and empower my said attorneys and proxies, or any of them, for me and in my name * * * to vote and take such action at said meeting, or any adjournment thereof, as said attorneys and proxies may deem expedient with respect to the plan proposed in the notice for said meetings for the reorganization of said the Newark Telephone Company under the laws of Ohio and/or the sale or exchange of the property, assets and franchises of said company."

With said notice and proxy was sent the following letter:

"The Newark Telephone Company.

"To the Stockholders of the Newark Telephone Company:

"The Newark Telephone Company, as at present constituted, was organized in 1894 under the laws of

West Virginia because of the double liability provision, then obtaining under the Constitution of Ohio, which did not apply in the state of West Virginia.

"At that time all available telephone station and switchboard equipment was claimed to be covered by letters patent belonging to the Bell Company and patent suits were threatened against any company attempting the use of such equipment. In addition to this the new company was entering into competition with an established company operating throughout the country, making it expedient to limit the liability of the stockholders in the event of the failure of the company by organizing under the laws of a foreign state.

"As referred to heretofore at our annual meetings, your officers and directors have been looking forward to the time when they could reorganize and turn over the property of the old West Virginia corporation to an Ohio company and thus avoid the payment of the extra annual tax to the state of West Virginia—which has amounted to many thousands of dollars during the life of the company—and to enable us to exercise the right of condemnation (eminent domain) of private property for rights of way when necessary, and public rights of way in municipalities in the event of being unable to agree with local authorities, together with the additional advantages of operating under laws with which we are familiar.

"THE PLAN WE ARE PROPOSING TO THE STOCKHOLDERS IS INTENDED TO PLACE AND MAINTAIN THE PRESENT STOCKHOLDERS IN THE SAME RELATIVE POSITION IN THE NEW COMPANY AS THEY NOW HOLD IN THE OLD WEST VIRGINIA COMPANY.

"It is proposed that shares of the present preferred stock, of $100 par each, will be exchanged for the shares of the new Ohio company, $100 par each, share for share; which new stock will be preferred both in assets and dividends and be entitled to a cumulative dividend of 6 per cent. per annum, payable in quarterly installments of $1.50 each and *will be subject to redemption* at any time after three years at $105 per share and all accumulated dividends.

"Under the plan proposed each share of the common stock of $100 par now outstanding will be exchanged for two and one-half shares of common stock without a par. The purpose of this exchange being to bring the number of shares of common up to a proper proportion with the preferred stock, as approved by the best financial authorities. This division of shares of common stock will add nothing in value to the present holdings nor will it take away anything of value represented by the present shares. If the present shares represent $100 property value, then each share of the new stock will represent $40 in property value and the shareholders will be left in the same relative position as before.

"The plan further contemplates the vesting of the voting power in the common stock for the election of directors and other incidental purposes so long as dividends are paid promptly on the preferred stock, but in the event dividends are deferred on the preferred stock for two successive quarters, then at the next annual or any intervening special meeting of the stockholders the preferred stock will become vested with voting power in conjunction with the

common stock and so continue until all back dividends have been fully paid.

"We are suggesting this plan because of the increasing difficulties of getting a sufficient representation of stockholders at the annual meetings to permit the transaction of business. Of the present 270 shareholders of the company, about 165 are women, most of whom do not care to make a study of management or take the responsibility of waiving any rights they may have by signing a written proxy and it is probable that when all back dividends have been paid and only the regular quarterly installments are expected, the interest in these meetings of the preferred holders will be necessarily less. This interest, however, would be immediately aroused should there be any interruption in the regular payments and the attendance of those holding preferred shares would then be easily secured.

"In addition to the foregoing plans, we are expecting to ask the stockholders at the meeting to revoke the action taken at the special meeting held on January 10, 1928, authorizing the issuance and sale of $150,000 par value of 6% serial notes, as we are now satisfied it will be to the advantage of the stockholders to have these notes issued by the new Ohio corporation rather than by the old company operating under the laws of West Virginia.

"We are hoping to be able, if our plans are successfully carried through, to pay all deferred dividends now due on the preferred stock at the time of the payment of the next regular quarterly dividend on April 10, 1928.

"Please assist us by sending in your proxies promptly so that we can effect the arrangement con-

templated and that no delays may be occasioned by an adjournment of the meeting on March 19th.

" Respectfully yours,
"W. L. Carey, President.
"C. H. Spencer, Vice President.
"W. C. Metz, Treasurer.
"T. J. Evans, Secretary.
"Dwight M. Warner.
"W. C. Newton.
"H. H. Postle.
"S. C. Alsdorf.
"L. W. Easton.
"Newark, Ohio, March 9, 1928.
"WLC:MJ"

The date of the meeting was March 19, 1928, and on March 13, 1928, the president of the company sent to the stockholders who had not signed proxies the following letter, to wit:

"The Newark Telephone Company.
"General Offices: Newark, Ohio.

March 13th, 1928.

"To the Stockholders of the Newark Telephone Company:

"During the past two years your officers and directors have been approached by a score or more persons claiming to represent certain banking, brokerage or stock and bond concerns, seeking to interest them in the sale of the control of your company.

"These concerns have little, if any, knowledge of the telephone business and are not telephone operators, but purveyors of so-called securities, and their interest generally is to secure a dominating interest in the company with a view of loading it up with

bonds, stocks, etc., to sell in the market and to make profits out of these sales rather than out of the successful management of the property.

"Because of the fact that our preferred stock is so widely scattered, and in many cases held by persons who are not in touch with the efforts being made for the company's upbuilding and the welfare of its stockholders, there is a possibility of some aggressive concern obtaining a strong foothold in the voting power of the company. Two or three small blocks of stock have been gathered up and at prices below their actual worth, because of false representations of certain of these persons.

"Many of the most successful companies, as a means of insuring a stable, efficient management, have a majority of their voting stock pooled and held by a trustee in order to prevent its alienation, but such course is impracticable with a company such as ours, where the average holdings of preferred stock are small and so widely scattered.

"As a means of accomplishing the same result, some of our local people, who have a pride in the company as a local institution and the welfare of the stockholders and community at heart, have recently acquired a considerable amount of the common stock, without prospect of immediate profit, in order to prevent the possible passing of the control of the company to these adventurers and speculators.

"We believe that your interest will be best served by joining with us in an endeavor to maintain a continuous, stable management *by concentrating the voting power in the common stock, a majority of which is now held by those interested with you in the stability and upbuilding of the company.*

"The preferred stock of the company is now on a stable, paying basis, and, we believe, a thoroughly safe investment, and by your cooperation its future will be assured.

"Yours truly,
"[Signed]   W. L. Cary, President.

"P. S.—If you have not already sent your proxy, please give the matter your immediate attention."

M. R. Hatch, one of the plaintiffs, was familiar with the affairs of the Newark Telephone Company and the value of its assets and was desirous of purchasing for himself and associates the control of the company, and after the president's letter of March 13, 1928, to the stockholders, Hatch acquired, from the owners thereof, 40 shares of the preferred stock of the company, and attended said meeting, and protested against the adoption of the proposed plan, and voted said 40 shares of preferred stock, and also 210 shares of common stock for which he held proxies, against the proposition.

The other plaintiff, the W-H Securities Company, is an Illinois corporation, organized by Hatch and his associates for the express purpose of acquiring stock of the Newark Telephone Company, but it failed to allege or prove any facts entitling it to relief unless Hatch is entitled to relief.

More than 90 per cent. of the stock of the corporation was represented at said meeting, and all of the stock represented at the meeting, except that controlled by plaintiffs and 124 shares owned by a Mr. Taylor, was voted in favor of said plan.

Hatch, one of the plaintiffs, then brought this action, alleging that he did so on behalf of himself and the other owners of the preferred stock of the

corporation, and later the other plaintiff, the W-H Securities Company, filed a pleading and joined in the prayer of the petition; no other stockholder has joined with the plaintiffs in their effort to prevent the carrying out of the plan, but, on the contrary, at the hearing on the motion to dissolve the temporary injunction, affidavits of the owners of 90% of the stock of the corporation were filed, which stated that said affiants knew and understood the plan and desired it to be carried out. Even if these affidavits were not competent on the hearing on the merits, and the right to insist on their incompetency was not waived, the other evidence in the case justifies the finding that this action is not being prosecuted with the approval and on behalf of any stockholder other than the plaintiffs.

Plaintiffs base their right to the relief sought on the claim that the officers and directors of the West Virginia corporation, by means of false and fraudulent representations made by them to said stockholders in said letter hereinbefore set forth, secured the approval of the plan to make said proposed transfer.

The representations claimed to be false are that in said letter to said stockholders said officers and directors represented that if the plan proposed should be adopted the preferred stockholders' rights in the Ohio corporation would be the same as in the West Virginia corporation; it is claimed that such representation was untrue, first, because the plan proposed and adopted contemplated the vesting of the voting power of the Ohio corporation in the common stock, whereas the voting power in the West Virginia corporation is vested in the preferred

stock; second, because the preferred stock in the West Virginia corporation has an interest in the profits and assets of the company beyond the preferences stipulated, and the plan proposed contemplates that the preferred stock in the Ohio corporation shall have no such interest; and, third, because the preferred stock of the West Virginia corporation is not callable, and by said plan it is proposed to make the preferred stock of the Ohio corporation callable.

No misrepresentations other than those contained in said letter are claimed, and the specific language by which it is claimed that said false representations were made is the following general statement in said letter:

"The plan we are proposing to the stockholders is intended to place and maintain the present stockholders in the same relative position in the new company as they now hold in the old West Virginia company."

The foregoing will be hereafter referred to in this opinion as the "general statement."

That the plan adopted is greatly to the advantage of the present officers and directors of the corporation, who are large owners of the common stock of the corporation, is evident; but if the owners of the preferred stock in the old company did not have the right to participate with the owners of common stock in the profits and assets of the corporation, after the stipulated preferred dividends had been paid and the prior lien of the preferred stock on the assets of the company had been satisfied, then the advantage accruing to the officers and directors is much smaller and is gained largely by taking from the pre-

ferred stock its voting power and vesting the same in the common stock, and it is claimed that by said general statement it was represented that the proposed plan did not involve any change in the voting power of stock.

That the important feature of the plan was to accomplish such change in voting power was made plain to the stockholders by the officers and directors who proposed the plan, first, in the notice of the meeting, wherein it was stated that the plan was to provide in the new Ohio corporation that if. the dividends on the preferred stock were promptly paid "the common stock shall be entitled to the *exclusive* voting power;" second, in the letter accompanying said notice, wherein it was stated that "the plan contemplates the vesting of the voting power in the common stock," and, third, in the later letter to the stockholders by the president of the company, wherein it was stated that "We believe that your interest will be best served by joining with us in an endeavor to maintain a continuous stable management by *concentrating the voting power in the common stock.*"

In view of these explicit and unmistakable statements it is not conceivable that said general statement in said letter accompanying the notice could possibly have been intended or understood to relate to the subject of voting power.

Moreover, there was no concealment of the fact that the advantage so far as voting power was concerned would accrue to the officers and directors of the company, for in the letter in which the president, on behalf of the officers and directors, asked the stockholders to join in the plan to concentrate

the voting power in the common stock, it was stated that they had "recently acquired a considerable amount of the common stock" and that a majority of the common stock was held by them and "those interested with you in the stability and upbuilding of the company."

It is further contended that said general statement in the letter accompanying the notice of the meeting was grossly false and fraudulent, because by said proposed plan the new preferred stock would not have a right to share with the new common stock in the distribution of the assets of the new company after the prior lien of the preferred stock on the assets of the company had been satisfied and the common stock capital had been paid to the common stockholders, which right, it is claimed, the present preferred stock has in the assets of the present company.

The rights of holders of preferred stock are controlled by contract unless there is a statute governing the matter. What the contract in that regard is in a particular case is ascertained by a consideration of the circumstances, as shown by the record of the corporation, under which the stocks of the corporation were issued, which includes the resolution passed at the stockholders' meeting at which the stock was authorized, and the stock certificate which is issued in accordance therewith; in this case the resolution in reference to the preferred stock of the old company provided that "said preferred stock shall bear *not to exceed* six per cent. interest per annum, either as *interest* or *dividends,* payable * * * out of the surplus *profits* or *earnings* of said company, before any dividends are paid upon

the common stock, * * * and the dividends upon said stock shall be cumulative,'' and that said preferred stock ''shall also be a preferred lien upon the assets of said company and have priority over and above the common stock of said company,'' and said preferences are also provided for in the certificates of preferred stock, and there is no provision in the resolutions or stock certificates or records of the corporation giving to the preferred stock any other or further right of participation; it should be said also that there was no express provision denying to the preferred stock a right to further participation in profits or assets; the record of the corporation also shows that the preferred stock has the right to vote equally with the common stock.

The general rule, where there is no statute, is that, in the absence of any other provision in the contract bearing on the question, the giving to stock a preferential cumulative dividend is construed to impliedly limit such stock to the stipulated dividend; in this case such limitation is expressly imposed by the language, ''shall bear *not to exceed* 6% * * * either as interest or dividend.''

It is also quite generally held that, in the absence of a controlling statute or other provision in the contract, the giving to preferred stock a prior lien upon the assets of the company impliedly denies its right to any further or other interest in the assets of the company.

We think that such a rule more nearly carries out the intention of the parties than the rule suggested by counsel for plaintiffs, to wit, ''that unless the right to share in the assets and surplus of the corporation upon the sale or dissolution is *specifically de-*

*nied* to the holders of preferred stock by the terms of their contract, then they have such right.''

There are authorities which support the rule contended for by counsel for plaintiffs, but we think that both reason and the weight of authority support the other rule—at least as to all assets, except those arising from an increase in value of corporate property, and it is not claimed that there is any ''unearned increment'' involved in this case.

When a stock is preferred both as to dividends and assets it seems reasonable to conclude that there was no intention to give it any further right in dividends and assets unless such an intention is indicated in some other provision of the contract. Does the fact that the preferred stock is given full voting rights indicate an intention not only to secure to such stock a preference as to dividends and assets, but, in addition, to give to it rights in the profits and property of the corporation remaining after said preferences have been fully satisfied?

We do not think so. Its voting power enabled it to deny dividends to the common stock, but did not enable it to increase its own dividends, which are expressly limited by the contract to ''not to exceed 6 per cent.,'' and of course it could not exercise its voting power to enlarge its right in the assets beyond that stipulated in the contract.

But if we are mistaken in our views just expressed, there is certainly sufficient doubt about the proposition to negative the idea that the officers and directors falsely represented the facts in reference thereto.

It is also claimed that said general statement was false and fraudulent because by said proposed plan

the preferred stock of the new company will be callable and subject to redemption at any time after three years at a fixed price—the present preferred stock not being callable.

Insomuch as the letter in which said statement was made contained the positive statement that the preferred stock of the new corporation "will be subject to redemption at any time after three years at $105 per share and all accumulated dividends," we do not think that said general statement was calculated to create the impression that the new stock was not to be callable, or that it was likely to be so understood; moreover, plaintiffs have nothing to complain of in reference to this claimed misrepresentation, because in the resolution by which the transfer was authorized there is no provision that the preferred stock of the new company shall be callable.

But, assuming that notwithstanding said explicit statements in said letter to the contrary, said general statement was so placed in said letter and so carefully worded as to convey the impression and be understood by the average layman to mean that the proposed plan did not involve the surrender of any rights by the holders of preferred stock, and that because of the fiduciary character of the relation of the officers and directors to the stockholders, and the fact that the adoption of the plan is greatly to the advantage of such officers and directors, a presumption arises that but for such representations said plan would not have been adopted, and that therefore the burden is cast upon such officers and directors to disprove such presumption, they have done so in this case.

Plaintiffs have not introduced any evidence tend-

ing to prove that any stockholder was deceived by said general statement, and the evidence discloses that, of 6,000 shares of stock, 5,646 were represented at the meeting, and that 5,272 shares were voted for the plan, and that of the 374 shares voted against the plan 124 were so voted by mistake, leaving only the stock controlled by plaintiffs voting against the plan. The evidence further shows that at the trial in the common pleas court affidavits of the owners of 5,249 shares were admitted in evidence by agreement of the parties, denying that they had been deceived in voting in person, or giving their proxies, and expressing their entire satisfaction with the plan, and that after said affidavits were introduced the trial was adjourned, by special agreement of the parties, to enable counsel for plaintiffs to interview the stockholders who had signed such affidavits, and that later a few of such stockholders were examined in court as witnesses, and that while some of them did not fully understand the details of the plan they were not deceived, and the evidence does not disclose that any stockholder was deceived or has indicated any desire to join with plaintiffs in this action.

A transcript of *all* of the evidence taken in the common pleas court was introduced in this court, and that includes the examination by plaintiffs of several stockholders concerning their signing said affidavits and the contents thereof, and the fact and reason for said adjournment, and at the trial in this court merely a formal objection was made as to the competency of the *affidavits*. It is not necessary to determine whether under all the circumstances said affidavits should be considered as evidence in this court, because the evidence introduced without ob-

jection is sufficient to negative the existence of a presumption that the alleged false representations caused or contributed to cause the adoption of said plan.

It is also claimed that insomuch as neither the notice of the meeting nor the resolution approving the plan contained a provision that the preferred stock of the new company should be callable, such preferred stock cannot be made callable.

That question is not involved in this action; the resolution authorizing such sale does not purport to make any change in the rights of preferred stockholders in that regard or in regard to preferences; plaintiffs have an interest in the West Virginia corporation, and by the decisions of the courts of West Virginia the corporation has a right to sell its assets for stock of the Ohio corporation (*Germer* v. *Triple-State Natural Gas & Oil Co.*, 60 W. Va., 143, 54 S. E., 509); and if plaintiffs are not entitled in this action to prevent the consummation of such sale by reason of said claimed false representations, their rights in the West Virginia or the Ohio corporation will have to be settled and determined and protected in some action other than this.

Having reached the conclusion that said plan was fairly adopted, without fraud or misrepresentation or concealment, and that its consummation is almost unanimously desired by the stockholders, we are of the opinion that plaintiffs are not entitled to the relief sought; we cannot anticipate in this action, that, in carrying out the details of the transaction as the directors are authorized in the resolution to do, a departure will be made from the terms of the resolution by which the plan was adopted, or that the

rights of the plaintiffs or any other preferred stockholder will be injuriously affected.

The conclusion we have reached in this case renders it unnecessary for us to consider the claim of the defendants to the effect that plaintiff Hatch is not the real owner of stock, or the circumstances and purposes of his acquisition thereof are such that he is not entitled to equitable relief, and that the other plaintiff having acquired all of its stock after the adoption of said plan, and with full knowledge of its adoption, is also not entitled to relief in a court of equity.

Our consideration of the evidence in the case leads us to the conclusion that the plaintiffs are not entitled to any relief at this time unless it be found that the adoption of said plan was brought about by fraud practiced upon the stockholders of the West Virginia corporation, and, as we have said, we do not so find, and therefore the judgment will have to be in favor of the defendants, dismissing the petition at the costs of plaintiffs.

*Judgment for defendants.*

FUNK, P. J., and PARDEE, J., concur.

Judges FUNK, PARDEE and WASHBURN, of the Ninth Appellate District, sitting in place of Judges KUNKLE, ALLREAD and HORNBECK, of the Second Appellate District.